# STATE OF MICHIGAN

# COURT OF APPEALS

WAYNE WATKINS,

Plaintiff-Appellant,

v

SAGINAW'S FAMOUS FRIED CHICKEN, LLC,
doing business as POPEYE'S CHICKEN, and
EARL PEGUES,

Defendants-Appellees.

UNPUBLISHED
May 10, 2018

No. 337288
Saginaw Circuit Court
LC No. 16-029582-CZ

Before: SHAPIRO, P.J., and M. J. KELLY and O'BRIEN, JJ.

PER CURIAM.

Plaintiff appeals the trial court's order granting defendants' motion for summary disposition pursuant to MCR 2.116(C)(8) (failure to state a claim) and (C)(10) (no genuine issue of material facts). For the reasons set forth below, we reverse the trial court's grant of summary disposition and remand for further proceedings consistent with this opinion.

## I. FACTS

Plaintiff was a shift manager at the Saginaw, Michigan location of defendant Earl Pegues's (Pegues) Popeye's franchise, defendant Saginaw's Famous Fried Chicken dba Popeye's (Popeye's). Defendant Pruitt (Pruitt) was Popeye's head of operation and plaintiff's supervisor. Plaintiff was hired on October 22, 2012. In January of 2014, Pegues's franchise established an anti-fraternization policy in response to issues that arose when franchise employees began dating one another. Pruitt admitted that he was accused of fraternizing with and favoring certain employees, although he denied the veracity of these allegations. Fred Alexander, the then general manager of the Popeye's, testified that he knew of at least one relationship that Pruitt had engaged in with another employee. Plaintiff testified that he had warned Pegues of these alleged relationships multiple times during his employment with the franchise, but Pegues denied that plaintiff ever mentioned the relationships or that plaintiff openly opposed sexual harassment of female staffs. Plaintiff admitted that he did not know whether these relationships were consensual.

On May 30, 2014, the father of an employee, Tiffani Pipkins, reported to plaintiff that Pruitt had approached Pipkins in the parking lot and requested to see her "twins," referring to her breasts. Plaintiff reported the allegation to Pegues, and told him that "we've had this problem for

some time." Plaintiff also expressed his expectation that an investigation would be conducted, and that the sexual harassments would be stopped. Pegues investigated the matter the next day and spoke to Pruitt, who denied making the statement to Pipkins. Both Pegues and Pruitt agreed that such a statement would constitute sexual harassment.

Three days later, on June 2, 2014, plaintiff was issued a three-day suspension without pay, ostensibly because of problems with the Hazard Analysis Critical Control Point (HACCP) log, which records food temperatures to ensure that they do not fall below levels safe for consumption, and customer complaints. Plaintiff had never been threatened with suspension or termination prior to informing Pegues of Pruitt's alleged sexual harassment. According to Pegues, after being told of the suspension, plaintiff came to him and said, "This is bullshit." Plaintiff denied cursing or using profanities during this discussion. Pruitt added that plaintiff went on to say, "[W]e need to be taking care of more important things other than the HACCP log when we got . . . a sexual harassment case that's going on."

The parties presented conflicting testimony regarding whether plaintiff's employment was terminated after the suspension. Pegues testified that when plaintiff returned to work, he simply handed in his uniform, stating, "Well, you all was [sic] going to fire me anyway." However, during his deposition, Pegues indicated that that plaintiff was terminated because he "developed an attitude." Ultimately, Pegues conceded that plaintiff was not fired for cursing. Pegues also discussed numerous customer complaints concerning plaintiff, but added that plaintiff was not terminated for these complaints. Pegues also explained that plaintiff was disciplined for multiple failures to complete the HACCP log, which he was required to complete as part of his duties. Defendants produced evidence of several incidents when plaintiff had failed to complete the log, one instance where plaintiff was disciplined for failing to report to work, and one instance of discipline stemming from "unacceptable customer service practices." Even so, Pegues specifically conceded that plaintiff was not terminated for failure to perform his managerial duties or because of customer complaints. Pegues also acknowledged that, usually, failure to complete an HACCP log results in a verbal warning. Indeed, no manager had ever been suspended or fired for failure to complete the HACCP log. Pegues and Pruitt claimed that they had no intention of terminating plaintiff's employment.

Plaintiff testified that when he returned to work, Pruitt gave him a document, and informed him that he had been terminated. The document explained that the termination was due to "[plaintiff's] actions, poor job performance[,] and creating an intimidating environment." After learning of his termination, plaintiff repeated his concerns about the alleged sexual harassment, but Pruitt assured him that "everything will come to light," after an investigation.

On July 9, 2014, plaintiff filed charges of unlawful retaliation and discrimination against Popeye's with the Equal Employment Opportunity Commission (EEOC). The EEOC investigated plaintiff's case, and concluded that reasonable cause existed to find that Title VII was violated, and that defendants unlawfully retaliated against plaintiff. After conciliation failed, plaintiff brought this action against defendants for unlawful retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 USC 2000e through 42 USC 2000e-17, and the Elliot-Larsen Civil Rights Act (ELCRA), MCL 37.2101 through MCL 37.2803. Plaintiff alleged that he objected to a continual pattern of sexual harassment by Pruitt, and that he was suspended and subsequently terminated as a result.

Defendants filed a motion for summary disposition pursuant to MCR 2.116(C)(8) and (10). In granting defendant's motion for summary disposition, the trial court stated that, prior to May 30, 2014, plaintiff had never discussed Pruitt's alleged pattern of engaging in sexual relationships with Popeye's employees. The trial court then indicated that Pruitt's alleged comment about Pipkins' breasts was an isolated incident, lacking the necessary severity and pervasiveness to constitute a hostile work environment. The court was also persuaded by defendants' proffered evidence of plaintiff's failures to properly complete the HACCP log, meet store goals, show up for work, refrain from cursing, and appropriately respond to customer complaints. For these reasons, the trial court held that plaintiff did not oppose sexual harassment, and thus did not engage in any protected activity. The court concluded that plaintiff's claims failed to establish causation because the alleged protected activity did not occur closely enough in time to defendants' adverse employment action. The trial court also held that the "[p]arties are not in dispute that Mr. Pegues may be dismissed as a Defendant under Title VII," and although it granted summary disposition to Popeye's on this claim, it did not discuss Popeye's with regard to Title VII.

## II. LIABILITY UNDER TITLE VII

On appeal, plaintiff argues that the trial court impermissibly dismissed his Title VII claims against Popeye's on the basis of the parties' stipulation that Pegues was not subject to individual liability under Title VII. We agree.[1]

The parties stipulated to the dismissal of Pegues as a defendant under Title VII. This is appropriate because Title VII does not provide for individual liability. See *Police v Suders*, 542 US 129, 138 n 4; 124 S Ct 2342; 159 L Ed 2d 204 (2004); *Wathen v Gen Electric Co*, 115 F3d 400, 405-406 (CA 6, 1997). However, in dismissing plaintiff's Title VII against Popeye's, the trial court expressed no reason for its decision, and did not specifically hold that plaintiff's Title VII claims against Popeye's were without merit. Because there was no evidence to suggest that

---

[1] We review de novo a trial court's decision on a motion for summary disposition. *Dextrom v Wexford Co*, 287 Mich App 406, 416; 789 NW2d 211 (2010). A motion under MCR 2.116(C)(8) tests the legal sufficiency of the complaint. *Maiden v Rozwood*, 461 Mich 109, 119; 597 NW2d 817 (1999). "All well-pleaded factual allegations are accepted as true and construed in a light most favorable to the nonmovant. A motion under MCR 2.116(C)(8) may be granted only where the claims alleged are so clearly unenforceable as a matter of law that no factual development could possibly justify recovery." *Id.* (citations and quotation marks omitted). When considering motions under subrule (C)(8), a court only examines the pleadings. MCR 2.116(G)(5). Summary disposition under MCR 2.116(C)(10) is proper when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Jimkoski v Shupe*, 282 Mich App 1, 4; 763 NW2d 1 (2008). "In reviewing a motion under MCR 2.116(C)(10), this Court considers the pleadings, admissions, affidavits, and other relevant documentary evidence of record in the light most favorable to the nonmoving party to determine whether any genuine issue of material fact exists to warrant a trial." *Walsh v Taylor*, 263 Mich App 618, 621; 689 NW2d 506 (2004).

Popeye's would not qualify as an "employer" under 42 USC 2000e(b), it was improper for the trial court to dismiss plaintiff's Title VII claims against Popeye's.

## III. PRIMA FACIE CASE OF RETALIATION

We agree with plaintiff that contrary to the trial court's holding, he presented sufficient evidence to establish a prima facie case of retaliation.

Under Title VII, employers are prohibited from retaliating against employees who oppose "unlawful employment practice[s]." *Wasek v Arrow Energy Servs, Inc*, 682 F3d 463, 468 (CA 6, 2012) (quotation marks and citation omitted). The analysis of a retaliation claim under the ELCRA is largely identical to the analysis under Title VII. See *Garg v Macomb Co Community Mental Health Servs*, 472 Mich 263, 273; 696 NW2d 646 (2005). Where a plaintiff attempts to prove retaliation by using circumstantial evidence, the

> claims are evaluated using the burden-shifting framework of *McDonnell Douglas v Green*, 411 US 792, 801-805; 93 S Ct 1817; 36 L Ed 2d 668 (1973). Under that framework, [plaintiff] must show that she (1) engaged in a protected activity, (2) that [defendant] knew of her protected conduct, (3) that [defendant] took an adverse employment action against her after her protected conduct, and (4) that there was a causal connection between the exercise of [plaintiff's] protected right and the adverse employment action taken by [defendant]. If [plaintiff] makes out this prima facie case, the burden shifts to [defendant] to produce a legitimate, non-retaliatory reason for its action. Assuming that [defendant] is able to produce such an explanation, the burden shifts back to [plaintiff] to put forward competent evidence from which a reasonable jury could conclude that the stated reason is merely pretextual. [*Montell v Diversified Clinical Servs, Inc*, 757 F3d 497, 504-505 (CA 6, 2014) (citations omitted).]

In the instant case, defendants do not dispute that plaintiff has met the second and third elements of retaliation under Title VII and the ELCRA. Therefore, only two elements—protected activity and causal connection—are in dispute.

## A. PROTECTED ACTIVITY

There are two types of protected activity: (1) the plaintiff may participate in a proceeding with the EEOC; or (2) the plaintiff may oppose "an *apparent Title VII violation*." *Wasek*, 682 F3d at 469 (emphasis added). The opposed conduct need not be an actual violation of Title VII in order to establish a protected activity. *Id*. In opposing such an apparent violation, the plaintiff must have merely had a "reasonable and good-faith belief that the harassing acts he was reporting were Title VII violations." *Id*. (quotation marks and citation omitted).

We agree with plaintiff's argument that the trial court erred in holding that he did not present sufficient evidence to establish that he opposed an apparent Title VII violation. In *Johnson v Univ of Cincinnati*, 215 F3d 561, 580 (CA 6, 2000), the Court recognized that "complaining to anyone (management, unions, other employees, or newspapers) about allegedly unlawful practices" is a valid form of opposition. In this case, it is not disputed that plaintiff alerted Pegues of Pruitt's allegedly harassing comment. However, plaintiff testified that he did

-4-

not stop there. Plaintiff indicated that he told Pegues that this was not the first instance of Pruitt sexually harassing fellow employees. Plaintiff also stated that he demanded an investigation into the matter so that the alleged pattern of sexual harassment would be stopped. See *Sawicki v American Plastic Toys, Inc*, 180 F Supp 2d 910, 918 (ED Mich, 2001) (acknowledging that sufficient personal opposition to alleged sexual harassment "could have taken the form of a verbal complaint *by the plaintiff* to management claiming that [the harasser] engaged in the sexual harassment of [] subordinates."). Although defendants presented testimony of other witnesses that dispute whether plaintiff did more than alert Pegues to Pipkins's father's presence and his complaint as to Pruitt's alleged harassment, summary disposition is improper when the question turns on the credibility of the witnesses and the weight to give each witness's testimony. *Skinner v Square D Co*, 445 Mich 153, 161; 516 NW2d 475 (1994).

Plaintiff is correct that the trial court erred when it interpreted *Radtke v Everett*, 442 Mich 368; 501 NW2d 155 (1993), to mean that Pruitt's alleged statement to Pipkins amounted to an isolated incident that did not rise to the level of severity and persistence necessary to establish a hostile work environment for sexual harassment purposes. In *Radtke*, 442 Mich at 394, the Court acknowledged that, generally, single instances of sexual harassment do not create a hostile work environment. *Id*. at 394. However, it explained that isolated incidents may create a hostile environment when the experience is "extremely traumatic." *Id*. at 395. The Court noted that physical restraint by an employer seeking to coerce sexual relations was an example of a sufficiently traumatic incident. *Id*. at 395-396. Barring extreme circumstances, a plaintiff must usually prove that: "(1) the employer failed to rectify a problem after adequate notice, and (2) a continuous or periodic problem existed or a repetition of an episode was likely to occur." *Id*. at 395.[2] See also *Montell*, 757 F3d at 504-505, holding that a supervisor who made sexually suggestive comments on one occasion to an employee reporting to him could lead an opposing employee to a reasonable, good faith belief that his conduct constituted sexual harassment where: (1) the supervisor prefaced his comments by acknowledging that they could result in disciplinary action against him; (2) once the comments were reported by the opposing plaintiff, the person to whom the report was made did not indicate that the comments could not have amounted to sexual harassment; and (3) the person to whom the comments were reported investigated to determine whether the comments were made.

In this case, although it was not alleged that Pruitt physically assaulted Pipkins, he was her supervisor, and was a partial owner of the Popeye's franchise. Pruitt answered only to Pegues, substantially limiting Pipkins's available recourse if she were to have reported Pruitt's alleged conduct to anyone within the Popeye's franchise. This is a relevant factor in determining

---

[2] The United States Supreme Court applied this analysis to situations of employer retaliation in *Clark Co Sch Dist v Breeden*, 532 US 268, 270-271; 121 S Ct 1508; 149 L Ed 2d 509 (2001). In that case, the Court held that, while a plaintiff opposing employer conduct need only have a reasonable belief that the conduct was unlawful, no reasonable person could believe that "simple teasing, offhand comments, and isolated incidents (unless extremely serious)" are severe and pervasive enough to constitute sexual harassment. *Id*.

whether a single incident of sexual harassment is sufficient to establish a reasonable, good faith belief that an employer's conduct amounted to sexual harassment. *Radtke*, 442 Mich at 395-396.

Moreover, Pruitt's alleged request to see Pipkins's "twins" can easily be understood as a sexual solicitation. Although Pruitt did not preface his alleged statement by acknowledging that they could get him into trouble, he did testify that such statements—if he actually made them—would have constituted sexual harassment. Pegues agreed. Once plaintiff reported the comments to Pegues, plaintiff was not informed that such statements could not have constituted sexual harassment. Rather, Pegues testified that he conducted an investigation into the matter.

Additionally, although it is clear that plaintiff's alleged previous complaints regarding Pruitt's history of relationships with fellow employees do not constitute opposing conduct, it has not been established that such prior complaints cannot serve as evidence that defendants "failed to rectify a problem after adequate notice," and that "a continuous or periodic problem existed" such that plaintiff's belief that Pruitt had engaged in unlawful sexual harassment was reasonable and in good faith. *Radtke*, 442 Mich at 395.

Relying on *Pettit v Steppingstone, Ctr for the Potentially Gifted*, 429 Fed Appx 524, 530-531 (CA 6, 2011), and to *Coleman v G4S Secure Solutions (USA), Inc*, ___ F Supp 2d ___ (ED Mich, 2016) (Docket No. 16-10250), slip op at 1, defendants argue that plaintiff did not engage in protected activity because it was within plaintiff's duties as a shift manager to report claims of sexual harassment to a higher authority within Popeye's. We disagree.

In this case, neither party has presented evidence that it was within plaintiff's duties as a shift manager to report allegations of sexual harassment to higher management or to conduct any investigation of such misconduct stemming from the actions of his supervisor. Pegues testified that it was within the scope of plaintiff's responsibilities to respond to customer complaints. The extent of any action plaintiff was required to take thereafter, is unclear. However, while plaintiff's job description may have included a duty to make Pegues aware of the accusations against Pruitt, it is unlikely that plaintiff's position would require him to demand that Pegues conduct some manner of investigation into Pruitt's alleged history of sexual harassment. It is true that expressing expectations of Pegues's future conduct was unlikely to be in plaintiff's own interests, suggesting that plaintiff's actions were done pursuant to his duties as a shift manager. See *Pettit*, 429 Fed Appx at 531 (acknowledging that a plaintiff in a retaliation action may still find relief—even where the plaintiff's alleged protected activities occurred within the scope of her duties of employment—when the plaintiff steps outside of her official capacity and acts in her own interest, as opposed to the interests of her employer). However, because making demands of superior employer authorities is so rarely required—or even advisable—of employees, it would appear that plaintiff's conduct went beyond any duty to relay the information regarding Pipkins's father's visit to Pegues. No evidence has been offered to suggest that plaintiff merely engaged in the usual performance of his job. See *Coleman*, slip op at 6-7.

Further, we find unpersuasive defendants' argument that plaintiff did not engage in protected activity because plaintiff's alleged previous reports regarding Pruitt concerned consensual relationships with other employees. Defendants are correct that vague objections are insufficient to establish protected opposition under the ELCRA, where such objections do not

indicate the plaintiff's belief that the actions complained of were illegal. Indeed, plaintiff admitted that he was not sure as to whether these past relationships were consensual. However, plaintiff did not stop at these vague assertions. Plaintiff further testified that he expressed his concern to Pegues that Pruitt had sexually assaulted Pipkins in this instance. Moreover, plaintiff stated that he expressed his expectation that Pruitt would be investigated and that the alleged sexual harassment would be stopped. These statements clearly indicate plaintiff's opposition to an unlawful activity.

Therefore, when the facts presented are viewed in the light most favorable to plaintiff, it is sufficient to conclude that plaintiff may have had a reasonable, good-faith belief that he had reported unlawful sexual harassment. See *id*. at 505.

## B.  CAUSATION

Defendants argue that plaintiff has failed to establish a causal connection between plaintiff's protected activity and the adverse employment action. We disagree.

The Sixth Circuit has described the burden of establishing a prima facie case as "a burden easily met." *EEOC v Avery Dennison Corp*, 104 F3d 858, 861 (CA 6, 1997) (quotation marks and citations omitted). To satisfy the causal link element, a plaintiff is required to "proffer evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action." *Id*. (quotation marks and citations omitted). "Accordingly, at the *prima facie* stage the burden is minimal, requiring the plaintiff to put forth some evidence to deduce a causal connection between the retaliatory action and the protected activity and requiring the court to draw reasonable inferences from that evidence, providing it is credible." *Id*.

Courts are cautioned against inferring causation on the basis of temporal proximity, alone. *Wasek*, 682 F3d at 471-472. It is possible for a plaintiff to establish a causal connection using only evidence of temporal proximity "[w]here an adverse employment action occurs very close in time after an employer learns of a protected activity." *Mickey v Zeidler Tool & Die Co*, 516 F3d 516, 525 (CA 6, 2008). Where some time has elapsed between the adverse employment action and the point when the employer learns of the protected activity, however, "the employee must couple temporal proximity with other evidence of retaliatory conduct." *Id*.

We conclude that material issues of fact exist as to whether plaintiff established a causal connection between the protected activity and termination of his employment. Plaintiff was issued a three-day suspension only three days after he spoke to Pegues about Pruitt's alleged conduct, and expressed his expectation that subsequent action would be taken to put an end to such actions. Plaintiff was terminated from Popeye's less than two weeks following his protected activity. Additionally, even if temporal proximity was insufficient, evidence that defendants knew of plaintiff's protected activity and the fact that plaintiff was suspended and terminated less than 13 days after his protected activity, both establish an "inference of causation where the particular circumstances strengthen the inference of causation." *McNett v Hardin Comm Fed Credit Union*, 118 Fed Appx 960, 965 (CA 6, 2004). In *McNett*, the Court held that the plaintiff had met the element of causation not only because of temporal proximity (13 days between plaintiff's termination and the protected activity), but also because of the employer's knowledge of the protected activity. *Id*.

As to the ELCRA, the question is not merely whether there was a causal link between the protected activity and the adverse employment action, but whether the opposition was a "significant factor" in the adverse employment decision. *Barrett v Kirtland Community College*, 245 Mich App 306, 315; 628 NW2d 63 (2001). This requires a showing of more than a causal link. *Id*. Evidence must be sufficient to enable a reasonable finder of fact to infer that the adverse action had a discriminatory or retaliatory basis. *Rymal v Baergen*, 262 Mich App 274, 303; 686 NW2d 241 (2004). This can be established with evidence that the adverse action occurred shortly after the protected activity. *Id*. Sufficient temporal proximity was found in *Rymal* when the adverse action began within approximately one month of the protected activity. *Id*. at 281, 311-312.

As discussed above, defendants' adverse employment action occurred within two weeks of plaintiff's protected activity. The witnesses' testimony also indicates that plaintiff was treated differently from other employees. Pegues first testified that plaintiff was terminated due to plaintiff developing an "attitude." However, Pegues also testified that two other employees had developed an "attitude," but were not fired for their conduct. It was later said that plaintiff was fired for cursing, although Pegues contradicted himself when he acknowledged that plaintiff was not fired for that reason. Pegues then testified that plaintiff was fired for failure to fill out the HACCP log in fulfillment of his duties as a shift manager, but this was again dispelled when both Pegues and Pruitt testified that they had never terminated an employee for failure to complete a HACCP log in the past. Pruitt further testified that he had never even suspended an employee for such failure. Pegues also admitted that plaintiff was not terminated for failure to complete managerial duties, customer complaints, or for failure to report to work.

Defendants' conflicting testimony only serves to lend credibility to plaintiff's assertion that the true reason for his suspension and ultimate termination was his protected activity. Where evidence conflicts, summary disposition is improper. *DeFlaviis v Lord & Taylor, Inc*, 223 Mich App 432, 436; 566 NW2d 661 (1997). Accordingly, plaintiff's claims under Title VII and the ELCRA are not defeated at the causal link stage, and plaintiff has successfully established his prima facie case for the purpose of withstanding summary disposition.

### D. PRETEXT

Finally, plaintiff argues that he has created a question of material fact as to pretext that precludes the grant of summary disposition. We agree.

In this next step of the burden-shifting analysis, we are to determine whether plaintiff has "demonstrate[d] that the proffered reason was not the true reason for the employment decision." *Montell*, 757 F 3d at 508 (quotation marks and citation omitted). When analyzing whether the proffered reasons is merely pretextual, we are mindful that "[p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" *Id*. (quotation marks and citations omitted). " 'At the summary disposition stage, the issue is whether plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation. If so, her prima facie case is sufficient to support an inference of discrimination at trial.' " *Id.*(citation omitted).

The trial court stated that defendants had other legitimate reasons to terminate plaintiff's employment. Specifically, it found that:

> Plaintiff was written up at least five times for not filling out the HACCP log, not meeting store goals, not showing up for work, and not handling customer complaints correctly. Plaintiff was suspended for three days due to poor work performance that Defendant's tried to counsel him on. During the suspension meeting, Plaintiff became very upset and refused to sign the suspension notice. On his way out, the Plaintiff told Mr. Pegues that the suspension was "bullshit[."]

However, defendants provided contradicting evidence regarding their decision to terminate plaintiff's employment. For instance, Pegues testified that failure to complete an HACCP log results in verbal warning, and that he had never fired any manager for failure to maintain an HACCP log. Pruitt also admitted that before this incident, he had never fire or suspended any manager for failure to complete an HACCP log. Further, although defendants alleged that plaintiff was terminated because of customer's complaint, Pegues admitted in his deposition that plaintiff was not terminated for customer complaints or for failure to report to work. In fact, Pegues even offered plaintiff a general manager position with the franchise in May of 2014, noting that he was happy with plaintiff's work. Regarding defendants' allegation that plaintiff told Pegues that the suspension was "bullshit, Pegues conceded that plaintiff was not fired for cursing. Indeed, there was testimony that two other employees had developed an "attitude," but were not fired for their conduct. "The credibility findings and the determinations [regarding these conducts] are questions of fact on which there is conflicting evidence in the record. This constitutes a genuine issue of material fact, and consequently must be resolved by a jury, not at summary judgment." *Montell*, 757 F 3d at 509.

Accordingly, we reverse the trial court's grant of summary disposition and remand for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Douglas B. Shapiro
/s/ Michael J. Kelly
/s/ Colleen A. O'Brien

-9-